### TAYLOR v. COMMISSIONER OF INTERNAL REVENUE.

### No. 7287.

Circuit Court of Appeals, Seventh Circuit.

Jan. 31, 1941.

James J. Magner and Chas. R. Sprowl, both of Chicago, Ill., for petitioner.

Samuel O. Clark, Jr., Asst. Atty. Gen., and J. P. Wenchel, Sewall Key, John W. Smith, and Robert N. Anderson, Sp. Assts. to Atty. Gen., for respondent.

Before EVANS, SPARKS, and TREANOR, Circuit Judges.

SPARKS, Circuit Judge.

This is a petition to review a decision of the Board of Tax Appeals disallowing deductions from gross income for the year 1934 claimed on account of losses on the securities of the Studebaker Mail Order Company, and memberships in certain clubs. The first was disallowed on the ground that the stock became worthless in a prior year, while the second was disallowed on the ground that the club memberships did not constitute ordinary and necessary business expense deductible under section 23(a) of the Revenue Act of 1934, 26 U.S.C.A. Int. Rev.Acts, page 671.

The taxpayer is a practicing attorney, and was a director, vice-president, and general counsel of the Studebaker Mail Order Company, a holding company which owned practically all the stock of the South Bend Watch Company, the Studebaker Watch Company and two other companies. Petitioner was given 1000 shares of the

common stock of the Mail Order Company in 1924, and thereafter bought 2300 shares in addition, paying a total of $36,462 for it. The South Bend Company was a manufacturing concern, while the Studebaker Watch Company was engaged in the sale of the watches made by the South Bend Company by mail order. Other subsidiaries of the Mail Order Company sold other merchandise on the installment basis or for cash. The companies put on an extensive advertising campaign, having determined in 1924 to promote the use of the name "Studebaker" in connection with the business of the South Bend Company because the name was well known in business. Two brothers, George and Clement Studebaker, had been active in the South Bend Company and continued so after it became a subsidiary of the Studebaker Mail Order Company.

From the year 1930, the Mail Order Company began to lose money, and by 1932, with its carry-over from the two previous years, the losses totalled over $900,000. Early in that year a creditors' committee organized by trade creditors took over and conducted the business until the middle of 1933, collecting on accounts receivable, and auctioning certain of the machinery. With the proceeds of these collections and sales, they were able to pay off the trade creditors, settling on the basis of 50 cents on the dollar. The Board found, and there was evidence to support the fact that there was no active business after 1932, and the company was in process of liquidation. During the early part of the year 1933, there was also owing to a group of banks, the sum of $96,000, on notes of the South Bend Company, guaranteed by the Mail Order Company and the two Studebakers. In order to prevent foreclosure of the real estate owned by the South Bend Company, an arrangement was made with the various banks, whereby the property was deeded to one of the banks which was to hold it for the benefit of the group. At the same time there was an oral agreement that the property would be held for a year ending April, 1934, during which the company might repurchase it for $102,500, the amount of the obligation and interest. The property was not repurchased, and in June, 1934, the company forfeited its charter.

We find considerable evidence in support of the Board's conclusion that the stock became worthless prior to the year 1934, for which the deduction was claimed. June 15, 1933, a communication signed by George M. Studebaker, president of the Mail Order Company, was sent to all stockholders of the company, stated to be "in the nature of a final report, as liquidation, insisted on by creditors holding notes payable of the South Bend Watch Company and carried out by their representatives in charge, required the sale of all materials and machinery of your Company and subsidiaries." The letter went on to say that even after this sale, there was a large unpaid balance remaining, and that this had so affected the business that it was doubtful that any recovery could ever be made. In addition to the trade and bank creditors, the company also owed George Studebaker a total of over $40,000, secured by assignment of the accounts receivable. He had, however, agreed to cancel this indebtedness in the event that it became otherwise possible to reorganize the business.

The income tax return filed by the company March 31, 1933, recited that in February, 1932, the South Bend Company had gone into liquidation by a creditors' committee, and that there were no activities other than realization on assets and discharge of liabilities; that there were no operations for profit by the Mail Order Company or the Studebaker Watch Company. A similar statement was filed for the year 1934, reciting that the Mail Order Company had no report of operation for the fiscal year ending March 31, 1934; that its subsidiaries were all being liquidated, and that they had conducted no business whatever for the period of about two years; that the only activity that had existed had been the desultory collection of the small collectible balance on accounts receivable, the expenses in connection with which had really been more than the amount collected.

In November, 1933, petitioner sold to a brokerage firm operated by John Seerley, the secretary of the Mail Order Company, 1000 shares of its stock for $25. In his letter confirming the transaction, Seerley stated that his only interest was a long shot that he was taking to attempt the reorganization of the company, and that he wanted him to feel that he was exerting himself in order to enable him to make a sale and thereby establish a loss. The stock had by that time been delisted on the Chicago Stock Exchange.

While the foregoing facts all point to the conclusion reached by the Board, that the stock became worthless prior to the year

1934, petitioner points to other facts which he insists bear out his contention that there still remained some possibility of rehabilitating the company, and that as long as such possibility remained it could not be said that the stock was worthless. He calls attention to the fact that after the final report letter to the stockholders, in which it was stated that it was doubtful that any recovery could ever be made, a representative succeeded in interesting a gentleman said to be one of the best merchandising men with Sears Roebuck and Company in a plan for the reorganization of the Mail Order Company. Negotiations were carried on well into the year 1934, and arrangements were made whereby the franchise tax bill for the corporation was reduced from $1,800 to $200. Arrangements had already been made for redemption at any time up to April, 1934, of the real property deeded to the bank creditors on payment of the actual indebtedness due on the notes.

There had been no litigation against the company. Its good will remained intact—it had a mailing list of customers and was still receiving about fifty requests a week for catalogs, and one of its employees had moved some of the equipment into his own home where he did all the repair work sent in. The president testified that about one hundred men were employed at the plant during 1933 in the production of watches. The company had accounts receivable of a face amount of over $500,000. Even after the delisting of the stock on the Exchange, there were still some over-the-counter sales clear on down to June, 1934. Seerley, the secretary of the company, testified that in his opinion the stock was worth from 10 to 25 cents a share at the close of 1933 (although of course there was also introduced in evidence his letter stating that he was taking a long shot in paying petitioner $25 for one thousand shares in November, 1933). Petitioner contends that these facts show that no identifiable events establishing worthlessness occurred prior to 1934, and that the only identifiable events by which the worthlessness became finally established occurred in 1934—the expiration of the period of redemption without exercise of the option to repurchase by April, 1934, and forfeiture of the corporate franchise and dissolution of the corporation by decree of the Superior Court in June, 1934.

While the factors relied upon by petitioner might perhaps have been given more weight by the Board, we cannot say that they were so compelling as to require a finding that all value in the corporation and its stock was not extinguished until 1934. It was entitled to consider all the evidence introduced, and in the light of the whole body of evidence, we certainly can not say as a matter of law that there was none sufficient to support its finding. We find no error in the holding of the Board that the stock became worthless prior to the year for which the deduction was claimed.

The second item for which a loss was claimed related to three club memberships which petitioner asserted he had purchased for business and professional purposes. In disallowing the deduction, the Board stated that the social and personal aspect of the transactions appeared to have been at least of equal importance with whatever business or professional benefit there might have been. Section 23(a) of the Revenue Act of 1934 permits deduction of all ordinary and necessary expense paid or incurred during the taxable year in carrying on any trade or business. We cannot say that three club memberships purchased in prior years and used by petitioner for the entertainment of his family and friends, as well as his professional clients, constitute a business or professional expense for the year in which the taxpayer determines to relinquish them and finds himself unable to obtain a purchaser.

The decision of the Board of Tax Appeals is affirmed.